UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JESUS ORLANDO MARTINEZ,

     Petitioner,

   v.

ROBERT A. KIRKPATRICK,

     Respondent.
_____

**DECISION and ORDER**
**No. 10-CV-6691 (MAT)**

## I. Introduction

 *Pro se* petitioner Jesus Orlando Martinez ("Petitioner") timely petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his custody pursuant to a judgment entered against him on May 17, 2005, in New York State Supreme Court, Monroe County, convicting him, after a jury trial, of three counts of Sodomy in the First Degree (N.Y. Penal Law § 130.50(3)) and one count of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)).

 For the reasons stated below, the petition is denied.

## II. Factual Background and Procedural History

 Petitioner's convictions arise from four separate sexual assaults against three young girls. The incidents occurred in Rochester, New York, during the summer of 2000. At the time of the assaults, the girls (referred to herein as "G.R.," "Y.A.," and "N.G." to protect their privacy) lived together in the same home as

1

Felix Vega ("Vega"). (Trial Transcript ("TT."), 160, 338). Petitioner was acquainted with Vega through Vega's aunt. (TT. 338). Vega was the boyfriend of G.R.'s mother, Ylenia DelGado ("DelGado"), and he would often watch the children while she was at work. (TT. 337).

Around August 16, 2000, Vega allowed Petitioner to take G.R. to his home in order to play with another girl. (TT. 161). However, there was no one else at the apartment when Petitioner and G.R. arrived. (TT. 161). Petitioner brought G.R. into his bedroom, took off her pants, pushed her onto the bed, removed his pants, and inserted his penis into her anus. (TT. 160-63). When he was done, he threatened to hurt G.R.'s cousin, N.G., if G.R. told anyone what had happened. (TT. 164). Petitioner gave G.R. a bath and drove her home. (TT. 165).

About two weeks later, Vega let Petitioner take G.R. and her sister, Y.A., to  a park. (TT. 169-70). Petitioner allowed the girls to play outside for a while, but when they were done, he drove them to his apartment. (TT. 170). He told G.R. to shower and called her into the bedroom after she had dressed. (TT. 172). Petitioner pulled down G.R.'s pants, took off his pants, and inserted his penis into her anus. (TT. 172).

Y.A. testified that Petitioner told her to take a bath when she and G.R. arrived at the apartment. (TT. 213, 261, 275). When she had finished bathing, Petitioner had her come into the bedroom,

take off her towel, and lie face down on his bed. (TT. 217-18).
Petitioner then inserted his penis into her anus. (TT. 218-19).
Petitioner told Y.A. to "shut up" when she began screaming. (TT.
220). When he was finished, he threatened to hurt Y.A.'s cousin,
N.G., if she told anyone what had happened. (TT. 221). G.R. and
Y.A. told each other what had happened after they got home. (TT.
221).

Around August 19, 2000, during a party for G.R., N.G.'s
stepfather allowed Petitioner to take N.G. out to buy a dress. (TT.
274). Petitioner had N.G. pick out three dresses from Family
Dollar, and after they had finished shopping, he drove N.G. to his
apartment. (TT. 278). Once there, he told N.G. to take a bath and,
while she was in the bath, Petitioner entered the bathroom wearing
only a white t-shirt and underwear. (TT. 279). When petitioner
touched N.G.'s vagina with his finger, she hit him in the head with
a nearby cup. (TT. 279-80). Petitioner then took his penis out of
his underwear as he dried N.G. with a towel, but put his penis back
in his underwear when N.G. turned around. (TT. 281-82). Petitioner
told N.G. to put on one of the three new dresses, and then he drove
her home. (TT. 282). Before she left, however, he threatened to
kill N.G. and her mother if she told anyone what had happened. (TT.
283). He took the two remaining dresses and, handing them to N.G.
in a big bag, told her to give them to G.R. and Y.A. (TT. 283).

Four years later, Y.A. told her aunt what had happened. (TT. 222). After meeting with Child Protective Services, G.R. and Y.A. reported the assaults to the police in February of 2004.(Suppression Hearing Transcript ("H."), 12). During a meeting with police investigators, the children separately identified Petitioner from a photo array. (H. 12). Police then met with N.G. after speaking with her mother. (H. 22). After viewing one of the photo arrays, N.G. identified Petitioner's photo as depicting the person who had touched her. (H. 24-25).

Police arrested Petitioner in connection with the investigation on March 3, 2004, and brought him to an investigators' office for an interview. (H.54-59). Before questioning Petitioner, Officer Orlando Rivera ("Officer Rivera") downloaded and printed a Spanish translation of the standard Miranda[1] warnings from the internet. (H. 60). He used Spanish Miranda warnings from the internet because the police station was missing the Spanish Miranda cards customarily given to Spanish speaking suspects. (H.60-61). When the Spanish Miranda warnings were printed, however, one word from the warnings was cut off on the right hand side of the page, appearing as "declara-." (H. 67). After reading the Miranda warnings to Petitioner as they appeared, Officer Rivera handed the form to Petitioner, who read them to himself, nodded, and handed it back. (H. 68). Petitioner then

---

[1] Miranda v. Arizona, 384 U.S. 436, 479 (1966).

marked "si" on a card with the English <u>Miranda</u> warnings printed on it to signify that he understood the Spanish <u>Miranda</u> warnings. He also verbally indicated that he understood what Officer Rivera had said to him, and agreed to talk with the police. (H. 72).

Petitioner made several incriminating statements in this interview. Before investigators informed Petitioner of the nature of the charges, Petitioner volunteered that he dated older, married women (TT. 319). He also acknowledged knowing G.R., Y.A., and N.G., and told police that he had fed and bathed them. (TT. 315-17, 329). However, Petitioner denied sexually assaulting the children. (TT. 317). The interview lasted approximately one hour.

A Grand Jury indicted Petitioner on April 23, 2004. (Arraignment Transcript "A.", 2). When Petitioner moved to suppress his statements to the police, the court scheduled a suppression hearing for August 30, 2004. (H. 111-12). At the hearing, the court heard testimony from the officers involved in the interview. (H. 111). Petitioner did not testify. Crediting the prosecution's witnesses, the trial court denied Petitioner's motion, finding that he had voluntarily waived his <u>Miranda</u> rights. (H. 112).

Petitioner proceeded to a jury trial on February 14, 2005. The court heard testimony from G.R, Y.A., and N.G., as well as Vega, DelGado, and the police officers involved in Petitioner's arrest and interview.

The prosecution also called expert witness Stefan Perkowski ("Perkowski") to testify on Child Sexual Abuse Accommodation Syndrome ("CSAAS"). The purpose of this testimony was to explain counterintuitive behavior patterns of sexually abused victims. (TT. 410). Having never met the victims, Perkowski stated that he could not know whether they had been sexually abused. (TT. 419).

Perkowski testified that CSAAS has five characteristics. The first characteristic is helplessness, where the dependent child is unaware that an adult is misleading them. (TT. 411-13). The second characteristic is secrecy, where the abusive adult hides the abuse from both the public and the child. (TT. 413). Perkowski noted that an adult may accomplish this by combining the abuse with routine tasks, such as removing the victims' clothes for baths. (TT.415-16). The third characteristic is accommodation, where the abused child will go along with whatever the abuser requires. (TT.413). The fourth characteristic is entrapment, in which abused children remain silent because they are afraid that the discovery of the abuse will upset other adults. (TT. 413). The fifth characteristic is suppression and recantation, where child victims may remain silent because the abuser has threatened them or because they pretend that the abuse never happened. (TT. 416).

On February 16, 2005, the jury found Petitioner guilty of three counts of Sodomy in the First Degree and one count of Sexual Abuse in the First Degree. (TT. 507). On March 18, 2005, Petitioner

was sentenced to concurrent, determinate prison terms of 25 years for each count of sodomy and 7 years for the count of sexual abuse. (Sentencing Hearing Transcript ("S"), 12). Petitioner was also adjudicated a sex offender and ordered to serve five years of post-release supervision. (S. 12).

On direct appeal, Petitioner claimed that (1) he had invalidly waived his <u>Miranda</u> rights, and (2) the trial court had improperly admitted Perkowski's expert testimony. (Petition at 7; Petitioner's Appellate Brief, Petition, Exhibit A at 16-17). The Appellate Division, Fourth Department, of New York State Supreme Court, rejected both claims. It held that Petitioner's expert testimony claim was unpreserved for review and, in any event, without merit. The Fourth Department also held that his invalid <u>Miranda</u> waiver claim was also without merit. <u>People v. Martinez</u>, 68 A.D.3d 1757 (4th Dep't 2009).

Petitioner applied for leave to appeal to the New York Court of Appeals, but declined to raise the fair trial issue, raising only the issue of the improper <u>Miranda</u> waiver. The Court of Appeals denied his application on March 18, 2010. (Certificate of the New York Court of Appeals Denying Leave to Appeal, Respondent's Brief, Exhibit F). Petitioner filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 7, 2010. Respondent answered on February 23, 2011.

## III. General Principles Applicable to Habeas Review

### A.   The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412.

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner

8

to the facts of a particular case. Williams, 529 U.S. at 413.  The
inquiry for a federal habeas court is not whether the state court's
application of the governing law was erroneous or incorrect, but
rather whether it was "objectively unreasonable." See Id. at
408-10; see also Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir.
2003). "[A] federal habeas court is not empowered to grant the writ
just because, in its independent judgment, it would have decided
the federal law question differently. The state court's application
must reflect some additional increment of incorrectness such that
it may be said to be unreasonable." Aparicio v. Artuz, 269 F.3d 78,
94 (2d Cir. 2001).

**B.    The Exhaustion Requirement**

"A federal court may not grant a writ of habeas corpus to a
state prisoner 'unless it appears that the applicant has exhausted
the remedies available in the courts of the State, or that there is
either an absence of available State corrective process or the
existence of circumstances rendering such process ineffective to
protect the rights of the prisoner.'" Bossett v. Walker, 41 F.3d
825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995)
(quoting 28 U.S.C. § 2254(b)). A petitioner must have presented the
substance of his federal claims to the highest court of from which
review may be obtained in order to fulfill the exhaustion
requirement. Id. (citations omitted).

With regard to an unexhausted claim for which the habeas petitioner no longer has "remedies available" in the state courts within the meaning of 28 U.S.C. § 2254(b), the federal court will "deem" the claim exhausted. Bossett, 41 F.3d at 828 (citing inter alia, Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991) (other citations omitted). Typically, however, the same procedural default that gives rise to statutory exhaustion prevents the habeas court from addressing the merits of the claims, except upon a showing of cause for the default and actual prejudice to the petitioner. Bossett, 41 F.3d at 829 (citations omitted).

## IV. Analysis of Petitioner's Claims

### 1.   The Miranda Waiver Claim is Without Merit

Petitioner claims that he gave an involuntary statement to police investigators because they failed to properly warn him of his Miranda rights before his interrogation. He alleges that the police (1) lacked sufficient experience with the Spanish language to communicate the Miranda warnings, and (2) provided an inadequate Spanish translation of the English Miranda warnings.

Miranda requires police to advise suspects of their "Miranda rights" before beginning custodial interrogation. A suspect must be warned that he has "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning

if he so desires." Miranda v. Arizona, 384 U.S. at 479 (1966). Miranda does not require police to recite the exact language of these warnings as long as the language they use is a "fully effective equivalent." Id. at 476. The failure to obtain a valid waiver generally results in the exclusion of a suspect's statements. Id. at 500.

Police must ensure that the substance of the Miranda rights are conveyed to suspects in an intelligible fashion. United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991). A Spanish translation of the Miranda warnings that does not mirror the language of the English version will suffice as long as it "adequately and intelligently" informs suspects of their Miranda rights. Avincola v. Stinson, 60 F.Supp.2d 133, 159 (S.D.N.Y. 1999); see also U.S. v. Villegas, 928 F.2d 512, 518 (2d Cir. 1991) (holding that the manner in which Miranda warnings were administered "pass[ed] muster" where a co-defendant read a Spanish version of the Miranda warnings to defendant, who "nodded affirmatively" after reading them himself).

The state bears a "heavy burden" of showing that a suspect knowingly and intelligently waived his Miranda rights. Id. at 475. A voluntary waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 422 (1986). A petitioner's waiver is valid

11

where a "totality of the circumstances surrounding the interrogation" reveals "both an uncoerced choice and the requisite level of comprehension[.]" Id.

In a habeas corpus proceeding, state court factual determinations are presumed correct. 28 U.S.C. § 2254(e)(1). A petitioner bears the burden of rebutting such factual determinations by clear and convincing evidence. U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).

In the Miranda context, however, the ultimate question of whether, under the totality of the circumstances, the challenged confession was "voluntary" is a "legal question meriting independent consideration in a federal habeas corpus proceeding." Miller v. Fenton, 474 U.S. 104, 117 (1985). The voluntariness of a confession has a "uniquely legal dimension" which involves analyzing the facts of a case in light of constitutional principles. Id.

Nevertheless, the presumption of correctness applies to subsidiary factual aspects of an interview, such as "the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda

12

warnings," because such questions "often require the resolution of conflicting testimony of police and defendant." Id. This Court is bound by such subsidiary factual findings as long as they are "fairly supported in the record." Id.

The suppression court heard testimony from the police officers involved in Petitioner's interview. Although Petitioner did not testify, he offered several arguments why the court should suppress his statements. He argued that Officer Rivera was an inadequate interpreter, noting that Officer Rivera lacked formal training and certification in the Spanish language and had demonstrated difficulty in correctly translating the English Miranda warnings into Spanish. Petitioner also argued that the Spanish printout of the Miranda warnings was defective because they were (1) not a parallel equivalent of New York State's standard Spanish Miranda warnings and (2) missing half of a word. (TT. 107).

The suppression court credited Officer Rivera's account of the Petitioner's interrogation, finding that Officer Rivera (1) downloaded and printed a Spanish version of the Miranda warnings, (2) read the Spanish warnings to Petitioner, (3) watched Petitioner read the warnings and nod affirmatively to himself, (4) verbally confirmed that Petitioner understood the warnings, and (5) provided Petitioner with a Miranda card in English to sign in order to signify Petitioner's comprehension. The court therefore held that the totality of the circumstances established that

petitioner knowingly, intelligently, and voluntarily waived his Miranda rights prior to speaking with the police. (H. 124).

The Appellate Division affirmed the suppression court's ruling, determining that the record showed Rivera "was sufficiently trained and experienced in speaking and writing the Spanish language to enable him to properly advise the defendant of his Miranda rights" and that the "translation establishes that the Miranda warnings in Spanish were substantively the same as those in English." People v. Martinez, 68 A.D.3d at 1758 (citations omitted).

The totality of these circumstances reveal that the police adequately and intelligently informed Petitioner of his Miranda rights. The factual determinations of the state establish that Officer Rivera read a substantive Spanish translation of the Miranda warnings to Petitioner, who then nodded affirmatively as he read them to himself. The record fairly supports the state courts' findings, and Petitioner has not offered any evidence to rebut the presumption that the state courts' factual determinations are correct. Accordingly, I find that the Appellate Division's adjudication that Petitioner was properly warned of his Miranda rights was not contrary to or an unreasonable application of Supreme Court law. This claim must be denied.

2.    **Petitioner's Claim that He Was Denied a Fair Trial is Procedurally Barred from Habeas Review**

Petitioner claims that he was denied a fair trial because the trial court erroneously permitted expert testimony on Child Sexual Abuse Accommodation Syndrome. He argues that the expert testimony was used to improperly bolster the testimony of the child witnesses and establish that their allegations were true. The error was compounded, he argues, when the prosecutor commented on the expert testimony during summation. (Petition at 7; Petitioner's Appellate Brief, Petition, Exhibit A at 16-17).

On appeal, the Appellate Division rejected Petitioner's claim that the trial court improperly admitted expert testimony because he failed to fulfill the preservation requirement as codified in New York's contemporaneous objection rule, C.P.L. § 470.05(2).[2] The Appellate Division also ruled that the claim was without merit. People v. Martinez, 68 A.D.3d at 1758 (citations omitted). The court reasoned that the expert witness properly limited his remarks to general behavior of sexually abused children and refrained from

---

[2]

In order to preserve a question for appeal under New York law, the party claiming error must register a protest at trial or at a proceeding and either (a) the objecting party must make his or her position on the issue in question known to the trial court or (b) the trial court must actually decide the question that is being raised on appeal. N.Y. CRIM. PROC. LAW § 470.05(2). In order to preserve an issue for appeal, a general objection is not sufficient; lather the criminal defendant "must specifically focus on the alleged error." Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007). "New York courts consistently interpret [C.P.L.] § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." Id. at 709 (citing People v. McLane, 682 N.Y.S.2d 24, 25 (App. Div. 1st Dept. 1998).

commenting on the veracity of the victims' allegations. Id. The court also rejected Petitioner's contention that the prosecutor compounded the error by mentioning the evidence in her summation, stating that the prosecutor's closing remarks constituted fair comment on the evidence. Id.

When Petitioner sought leave to appeal to the New York Court of Appeals, he did not raise the claim that the trial court improperly admitted expert testimony. (Petitioner's Application for Leave to Appeal to the New York Court of Appeals, Respondent's Brief, Exhibit D). Petitioner's counsel asked the court to consider the issues of the necessary linguistic expertise required to administer Miranda warnings and the admissibility of information downloaded from the internet. Id.

The exhaustion rule requires petitioners to present their federal claims to "the highest court of the pertinent state before a federal court may consider the petition." Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990). Petitioners present a claim to the highest state court when they fairly notify that court of the federal issue. Petrucelli v. Coombe, 735 F.2d 684, 689 (2d Cir. 1984). Petitioners implicitly abandon other federal claims when they decline to present them to the highest state court, even if petitioners have raised the issues to other state courts. See Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (Holding unexhausted the

federal claims included in petitioner's attached brief but omitted from his leave application to the New York Court of Appeals).

Here, although Petitioner raised his fair trial claim to the Appellate Division of the New York Supreme Court, he abandoned the claim when he declined to raise it to the New York Court of Appeals. See id. Petitioner has therefore failed to present the substance of this federal claim to the highest court from which a decision could be obtained. The claim is unexhausted.

Nevertheless, a court may "deem" a claim exhausted if it is clear that the claim is procedurally barred from further state review. Bossett, 41 F.3d at 828. New York defendants may seek direct and collateral review of their judgments. Defendants are permitted one direct appeal to the Appellate Division of the New York Supreme Court and one request for leave to appeal to the New York Court of Appeals. N.Y. CRIM. PROC. LAW § 460.15. New York Criminal Procedure Law ("C.P.L.") § 440.10 sets forth the state method for collateral review of a judgment. N.Y. CRIM. PROC. LAW § 440.10. A motion pursuant to C.P.L. § 440.10 must be dismissed if an appellate court has already reviewed the claim on the merits. N.Y. CRIM. PROC. LAW § 410.10(2)(a). See Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991) (Holding that petitioners unexhausted federal claims that were raised on direct appeal were "deemed exhausted" because C.P.L. § 410(2)(a) prevented any further collateral state review).

17

Here, Petitioner's claim is deemed exhausted because it is procedurally barred from further state review. Petitioner is barred from presenting his fair trial claim to the New York Court of Appeals because he has already used the one leave application to which he was entitled. (Petitioner's Application for Leave to Appeal to the New York Court of Appeals, Respondent's Brief, Exhibit D). Collateral review of the claim is unavailable because the Appellate Division of the New York Supreme Court has decided the claim on the merits. People v. Martinez, 68 A.D.3d at 1758; Hoke, 93 F.2d at 121.

This Court is therefore proscribed from reviewing the fair trial claim unless Petitioner can demonstrate cause for the procedural default and actual prejudice resulting therefrom, or that he is factually innocent of the charges against him such that a fundamental miscarriage of justice would occur should this Court decline to hear the claim. Bossett, 41 F.3d at 829 (citations omitted). To be sufficient to excuse a procedural default, "cause" must be something external to the petitioner, something that cannot fairly be attributed to him. Murray v. Carrier, 477 U.S. 478, 485 (1986). In other words, demonstrating cause "must ordinarily turn on whether the prisoner can show that some "objective factor external to the defense" impeded counsel's efforts to comply with the state's procedural rule. Id. at 488 (giving, as examples of "external factors," a demonstration that the "the factual or legal

basis for a claim was not reasonably available to counsel" or that "some interference by officials . . . made compliance impracticable"). Attorney ignorance, mistake, or inadvertence is not "cause" because the attorney is the petitioner's agent when he acts-or fails to act-in furtherance of the criminal proceeding, and, accordingly, the petitioner bears the risk of attorney error. Coleman, 501 U.S. at 753 (citing Murray, 477 U.S. at 488). Attorney error that arises to the level of ineffective assistance within the meaning of the Sixth Amendment may constitute cause, but only if it amounts to an independent constitutional violation. Id.; accord Edwards v. Carpenter, 529 U.S. 446 (2000).

The "prejudice" prong requires that the petitioner show "actual prejudice," McCleskey, 499 U.S. at 493, "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," United States v. Frady, 456 U.S. 152, 170 (1982) (discussing cause and prejudice test required for collateral relief pursuant to 28 U.S.C. § 2255 where error not raised at trial or on direct appeal); accord, e.g., Murray v. Carrier, 477 U.S. at 493.

Here, Petitioner does not alleges cause or prejudice for his procedural default, nor does he allege a fundamental miscarriage of justice. Accordingly, this claim is dismissed as procedurally defaulted from federal habeas review.

**V.    Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.")

SO ORDERED.

S/Michael A. Telesca

DATED: January 17, 2012                    _____

MICHAEL A. TELESCAU

United States District Judge